UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>THOMAS O'REILLY )<br>)<br>Defendant. )<br>) | Docket No.: 17-CR-243 (SHS) |

**SENTENCING MEMORANDUM
ON BEHALF OF THOMAS O'REILLY**

Through counsel, Thomas O'Reilly ("Mr. O'Reilly") files the following Sentencing Memorandum setting forth all factors that the Court should consider in determining what type and length of sentence is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

United States Supreme Court Justice Anthony Kennedy has stated that, "our resources are misspent, our punishments too severe, our sentences too long."[1]  It is incumbent on this Court to, "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518, U.S. 81, 113 (1996).

Mr. O'Reilly requests a sentence of time served.

**GUIDELINE CONSIDERATIONS**

---

1 Justice Anthony Kennedy, Speech at the American Bar Association Annual Meeting, August 9, 2003, http://74.125.47.132/search?q=cache:RaV8HeXt5s0J:www.supremecourtus.gov/publicinfo/speeches/sp_08-09-03.html+Justice+Anthony+Kennedy,+American+Bar+Association+meeting,+August+9,+2003&cd=1&hl=en&ct=clnk&gl=us

1. **Nature and Circumstances of Offense**

Mr. O'Reilly was arrested for and plead guilty to destroying documents and other items relating at the direction of his superiors.  The destruction of evidence was related to a fraud scheme created and controlled by his boss.

2. **History and Characteristics of Mr. O'Reilly**

Mr. O'Reilly is fully aware of his wrongs, and he accepts full responsibility.  The unfortunate reality is Mr. O'Reilly's involvement in this case, and the reason he is in jail now it that he is a severe drug addict.  But for his addiction, he would very likely never ended up in this situation.  Mr. O'Reilly stands before this Court at the lowest point in his life.

As the Presentence Report will reflect, Mr. O'Reilly came from a divided home, and suffered severe issues because of it.  He began using drugs and has never turned back.  The issues he faced from that period of his life were only compounded by his experience in the military where he suffered abuse.  That abuse ultimately pushed him further into his addiction after he was discharged.

Mr. O'Reilly, has had a very difficult time recovering from his issues.  A spate of minor criminal cases, all related to his drug use, and several failed attempts at rehab have piled up on Mr. O'Reilly.  Despite these things he is still optimistic that he can do what he needs to do to reform his life.

Mr. O'Reilly has learned valuable lessons while at MDC.  He realizes now that childish decisions are things he must put behind him.  He is focused on his future and will take the lessons learned here with him for the rest of his life.

Mr. O'Reilly has tremendous potential. He is intelligent and energetic. With the right opportunity he will have the chance to advance far in his life, which has really only just begun.

Mr. O'Reilly should be judged on the whole of his life. He wants an opportunity to live a law-abiding life, where he can work to correct his misstep and continue his career.

One of this Court's colleagues, Judge Rakoff, says:

> [S]urely if every man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed the Courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F.Supp. 2d 506, 513-14 (S.D.N.Y. 2006). Based on that, Mr. O'Reilly's good far outweighs the bad. The sentencing factors found in 3553(a) weigh in favor of a sentence of time served, which is sufficient, but not greater than necessary to comply with the sentencing factors found in 18 U.S.C. 3355(a).

### 3. Specific and General Deterrence

Specific and general deterrence is a specific component of most sentences. Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id.*; *see also* Zvi D. Gabbay,

*Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

General deterrence is based, in part, on creating or enhancing a particular individual's sentence based on the prospect, entirely speculative and inchoate, of influencing some unknown future wrongdoer who has not committed, or perhaps even contemplated, a crime.  A person should receive the sentence *they* deserve, without significant consideration for what some other future, unknown person may deserve.  *See* Michael J. Lynch, *Beating a dead horse: Is there any basic empirical evidence for the deterrent effect of punishment*?, 31 Crime, Law & Social Change 347 (1999) (hereinafter "*Beating a dead horse*"), at 355 ("[m]ost assuredly, the assumption that a lesser increase in the rate of incarceration would have caused an inflated rate of offending is *just that* – an *assumption* or assertion *which cannot be demonstrated* except with data that make a great many assumptions about how individuals *might* behave given some set of *hypothetical* circumstances ") (emphasis in original).

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id*. at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id*. While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates .

. . were not sufficient to achieve statistical significance." *Id.* At 2. The report concluded, "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id*. At 1.

Similarly, an extensive report issued in 2015 by the Brennan Center for Justice (at New York University School of Law) concluded that, controlling for other variables, incarceration rates have increased to such an extent in the United States that they have not played a role in crime reduction for many years[2]. *See* Dr. Oliver Roeder, Lauren-Brooke Eisen & Julia Bowling, *What caused the Crime Decline*?, Brennan Center for Justice, at 7 (February 26, 2015) (hereinafter "*Brennan Report*") ("the current exorbitant level of incarceration has reached a point where diminishing returns have rendered the crime reduction effect of incarceration so small, it has become nil"). Synthesizing data from the past few decades with recently collected data, the *Brennan Report* determined that "incarceration has been decreasing as a crime fighting tactic since at least 1980…[and s]ince approximately 1990, the effectiveness of increased incarceration on bringing down crime has been essentially zero." *Id.* at 23.

---

2 Portions of this section and statistical sentencing information were taken from materials prepared by Joshua Dratel, Esq.

**Table 2: Crime and Incarceration Rates (1990-2013)**

|  | 1990-2013 | 1990-1999 ("1990s") | 2000-2013 ("2000s") |
|---|---|---|---|
| **Violent Crime** (murder, non-negligent manslaughter, forcible rape, robbery, aggravated assault) | 50% decline | 28% decline | 27% decline |
| **Property Crime** (burglary, larceny-theft, motor vehicle theft) | 46% decline | 26% decline | 25% decline |
| **Imprisonment** | 61% increase | 61% increase | 1% increase |

Sources: Federal Bureau of Investigation, Uniform Crime Reports; U.S. Department of Justice, Bureau of Justice Statistics.[13]

*Id.*

This lack of correlation between crime reduction and heightened incarceration rates is apparent from the simultaneous declines in state prison populations and crime rates in those states. *See Brennan Report*, at 27 (imprisonment and crime decreased by more than 15% in New York, California, Maryland, New Jersey, and Texas, which account for "more than 46 percent of the US population"). The *Brennan Report* cites the overestimation of the deterrent effect of heavy penalties as one possible factor in the ineffectiveness of incarceration as a crime reduction tool. *See Id.* at 26 (relying in part on the National Academy of Sciences report that concluded "insufficient evidence exists to justify predicating policy choices on the general assumption that harsher punishments yield measurable deterrent effects").





**Figure 2: Incarceration and Crime Rates (1980-2013)**

Source: *Federal Bureau of Investigation, Uniform Crime Reports; U.S. Department of Justice, Bureau of Justice Statics.*[22]

*Id.*

In this instance, a few more months of jail will not serve the need to provide deterrence. The fact that Mr. O'Reilly was apprehended and faces a swift definite punishment accomplishes these goals.

**4. Need to protect the public from further crimes of the defendant**

In 1996, The Sentencing Commission staff drafted a document entitled *Sentencing Options under the Guidelines*, that acknowledged non-prison sentences are associated with less recidivism than prison sentences, and that "[m]any federal offenders who do not currently qualify for alternatives have relatively low risks of recidivism compared to offenders in state systems and to other federal offenders on supervised release," and that "alternatives divert offenders from the criminogenic effects of imprisonment which include contact with more serious offenders, disruption of legal employment, and weakening of

family ties." U.S. Sentencing Commission, Staff Discussion Paper, *Sentencing Option under the Guidelines* (Nov. 1996), http://www.rashkind.com/alternatives/dir_00/USSC_sentencingoptions.pdf.

According to a June 2012 study by the Pew Center on the States, entitled *Time Served – The High Cost, Low Return of Longer Prison Terms* (hereinafter "*Pew Report*"), which analyzed state data reported to the federal government between 1990 and 2009, "offenders released in 2009 served an average of almost three years in custody, nine months or 36 percent longer than offenders released in 1990. The cost of that extra nine months totals and average of $23,460 per offender." *Id.* at 2, available at http://www.pewstates.org.uploadedFiles/PCS_Assets/2012/Prison_Time_Served.pdf.

Also, the *Pew Report* found that "for offenders released in 2009 after serving prison sentences for drug crimes: 2.2 years in prison, up from 1.6 years in 1990 (a 36% increase)." *Id*. at 3. Nor, with respect to many offenders, was there a correlation between the longer imprisonment and improved public safety. As the *Pew Report* concluded:

> [d]espite the strong pattern of increasing length of stay, the relationship between time served in prison and public safety has proven to be complicated. For a substantial number of offenders, there is little or no evidence that keeping them locked up longer prevents additional crime.

*Id*. at 4. *See also Id*. ("[a] new Pew analysis conducted by external researchers using data from three states –Florida, Maryland and Michigan – found that a significant proportion of nonviolent offenders who were released in 2004 could have served shorter prison terms without impacting public safety").

Mr. O'Reilly did not commit violence in this offense. This purely financial offense militates in favor of time served.

**5.     The Sentencing Range Established by the Sentencing Commission**

Pursuant to the plea agreement, the parties stipulated that, under the United States Sentencing Guidelines the range is 15-21 months.

**6.     The need to provide restitution to any victims of the offense**

Restitution is not applicable.

## Conclusion

For the foregoing reasons, Mr. O'Reilly respectfully submits that a sentence of time served is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553.

Respectfully submitted this 22nd Day of June, 2017.

> s/ Bradley L. Henry
> THE HENRY LAW FIRM PLLC
> 535 Fifth Ave.
> 25th Floor
> New York, NY 10017
> (646) 820-0224
> brad@henrylawny.com

## CERTIFICATE OF SERVICE

I do hereby certify that on June 22, 2017, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by U.S. mail. Parties may access this filing through the Court's electronic filing system.

> s/ Bradley L. Henry